UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SARAH P. HARPER, | CASE NO. 5:21-CV-01078-JRA |
| Plaintiff, | JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Sarah Harper filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On May 25, 2021, pursuant to Local Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry of May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

### PROCEDURAL BACKGROUND

Ms. Harper filed for DIB and SSI on August 1, 2018, alleging a disability onset date of June 6, 2018. (Tr. 74-75, 91-92). The claims were denied initially and on reconsideration. (Tr. 74-

107, 110-45). She then requested a hearing before an Administrative Law Judge. (Tr. 168-69). Ms. Harper  (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on July 22, 2020. (Tr. 35-71). On October 7, 2020, the ALJ issued a written decision finding Ms. Harper not disabled. (Tr. 12-30). The Appeals Council denied Ms. Harper's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Harper timely filed this action on May 25, 2021. (ECF #1).

## Factual Background[1]

### I. Personal and Vocational Evidence

Ms. Harper was 41 years old at the time of her alleged onset date, and 43 years old at the time of the administrative hearing. (Tr. 28, 46). Ms. Harper completed a high school education. (Tr. 28). She has been previously employed as a delivery driver, driver, waitress, and data entry clerk. (*Id*).

### II. Relevant Medical Evidence

Ms. Harper has systemic mast cell disease (also known as systemic mastocytosis,)[2] a rare condition for which she treats with providers in the Cleveland Clinic system. (*See*, *e.g.*, Tr. 365).

---

[1]    Ms. Harper raises error as to the ALJ's failure to explain Dr. Offutt's opinion. (Pl.'s Br., ECF #11, PageID 784-87). As such, she waives argument on issues not raised in the opening brief. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). I summarize only the evidence relevant to the claim Ms. Harper has advanced, *i.e.*, whether the ALJ's determination is unsupported by substantial evidence due to the failure to articulate her analysis of Dr. Offutt's opinion. (Pl.'s Br., ECF #11, PageID 781). Because this opinion also concerns Ms. Harper's limitations due to systemic mastocytosis, I provide a brief summary of the record related to this illness.

[2]    Systemic mastocytosis is a blood disorder that can affect multiple body systems. MedlinePlus, *Systemic mastocytosis*, National Library of Medicine, http://medlineplus.gov/genetics/condition/systemic-mastocytosis/ (last visited June 19, 2022). Symptoms include fatigue, skin

On June 12, 2018, Ms. Harper treated with Jennifer Melegari, CNP, for her systemic mastocytosis, complaining of breaking out in sweats and a rash, and drops in blood pressure. (Tr. 320). Ms. Harper tearfully reported her mastocytosis symptoms had started one month prior and consisted of uncontrolled diarrhea with cramping nausea, migraines with aura, worsening bone pain, unexplained bruising, palpitations, shortness of breath, and extreme fatigue. (*Id.*). Ms. Harper reported that she could not control her symptoms despite using an EpiPen, taking all other medications, and taking Benadryl "around the clock." (*Id.*). NP Melegari noted Ms. Harper had been diagnosed with stage 2 systemic mastocytosis in 2010. (*Id.*). Ms. Harper related that she knew her disease was progressing when her medications were increased, and she was diagnosed with diabetes. (*Id.*). Ms. Harper reported she had not left her air-conditioned home since she was fired from her job and could not tolerate the summer heat. (*Id.*).

Examination noted Ms. Harper's skin color was red and she had a fine mastocytic rash on her arms, chest, and legs that worsened the longer she sat in the doctor's office and the warmer she got. (Tr. 322). NP Melegari noted Ms. Harper's symptoms waxed and waned depending on her

---

redness and warmth, nausea, abdominal pain, bloating, diarrhea, gastroesophageal reflux, nasal congestion, shortness of breath, low blood pressure, lightheadedness, headache, attention or memory problems, anxiety, or depression. *Id.* Many individuals develop a skin condition characterized by raised patches of skin that sting or itch with contact or temperature changes. *Id.* Nearly half of individuals diagnosed with systemic mastocytosis will experience anaphylaxis. *Id.* Systemic mastocytosis is further divided into five subtypes, the most common and mildest form of which is termed "indolent" type. *Id.* The most severe type of systemic mastocytosis is mast cell leukemia. *Id.* Individuals with indolent mastocytosis tend to have only the symptoms described above; the more involved forms of mastocytosis typically involve impaired function of an organ such as the liver, spleen, or lymph nodes. *Id.* Individuals with less severe forms of systemic mastocytosis can have a near normal life expectancy, while the most severe types can involve a shortened life expectancy of a few months or years after diagnosis. *Id.*

histamine levels, stress, and heat. (*Id.*). NP Melegari noted Ms. Harper's systemic mastocytosis was progressing rapidly and referred her to hematology for evaluation and treatment. (*Id.*).

On September 5, 2018, NP Melegari indicated Ms. Harper's systemic mastocytosis was worsening recently and stated Ms. Harper must carry an EpiPen at all times because she is allergic to her own mast cells and histamine. (Tr. 307). Ms. Harper related she fears she may need chemotherapy to mediate her symptoms. (*Id.*).

Ms. Harper treated for systemic mastocytosis with Scott McGee, M.D., starting on October 19, 2018. (Tr. 356). Ms. Harper related to Dr. McGee that she was first diagnosed in 2008, confirmed by bone marrow aspirate and biopsy. (*Id.*). Ms. Harper stated antihistamines were the only treatment available to her when she was first diagnosed; Dr. Harper indicated Ms. Harper appeared to be taking every class of antihistamines. (*Id.*). Ms. Harper reported she was using her EpiPen twice per week, and had lost her job as a transport driver due to needing to use her EpiPen while driving. (*Id.*). Dr. McGee indicated he would review to see if Ms. Harper was eligible for any treatments introduced since 2008. (Tr. 358).

On December 7, 2018, Dr. McGee ordered a bone marrow biopsy. (Tr. 351-53). Ms. Harper returned for follow up on January 11, 2019. (Tr. 344). Ms. Harper reported having more outbreaks with the cold weather. (*Id.*). A bone marrow biopsy on December 28, 2018 did not show increased mast cells and was otherwise normal. (*Id.*; *see also* Tr. 347-50). Dr. McGee diagnosed Ms. Harper with systemic mastocytosis, consistent with indolent form, and continued her on her current antihistamine regimen. (Tr. 346). Dr. McGee referred Ms. Harper for an esophagogastroduodenoscopy (EGD) and colonoscopy, and recommended scheduling bone density testing. (*Id.*).

4

Ms. Harper presented to D. Cody Lollathin, PA-C, on December 11, 2019, complaining of left elbow pain. (Tr. 646, 650). PA Lollathin indicated that the elbow pain may be secondary to an autoimmune disorder and noted that systemic mastocytosis may manifest with musculoskeletal complaints, bony lesions, and osteoporosis. (Tr. 650). He recommended an MRI and discussed a further workup with laboratory evaluation but deferred to her current specialist for treatment plan if there was no indication for orthopedic surgery. (*Id.*). PA Lollathin provided Ms. Harper with a sling, and a prescription for ibuprofen and Flexeril. (*Id.*).

Ms. Harper returned on January 15, 2020, reporting that her symptoms had not improved despite taking 800 mg ibuprofen four to five times per day. (Tr. 652). Ms. Harper reported significant difficulty gripping, as well as pronation and supination, along with intermittent numbness and tingling into her fingers. (*Id.*). The elbow MRI showed a low-grade partial tear of the common extensor tendon as well as lateral epicondylitis. (Tr. 656). PA Lollathin prescribed hydrocodone for severe pain days, and counseled Ms. Harper on appropriate precautions for the medication. (*Id.*). Ms. Harper later had a cortisone injection on January 16, 2020, and was recommended to wear a wrist brace for sleeping and a tennis elbow brace. (Tr. 663).

On March 13, 2020, Ms. Harper met with her primary care physician, John McMenemy for follow up on her type 2 diabetes mellitus. (Tr. 705). Dr. McMenemy also gave Ms. Harper a handicap placard for the very hot days putting her at risk of a mast cell attack. (*Id.*).

## III.  MEDICAL OPINIONS

On October 15, 2018, Ms. Harper attended a consultative examination (CE) with Ellen Offutt, M.D. (Tr. 327-35). Dr. Offutt indicated Ms. Harper suffers from a number of autoimmune conditions, in addition to her systemic mastocytosis diagnosis. (Tr. 327). Ms. Harper informed Dr.

Offutt that any activity that causes her body temperature to rise and induce sweating causes a mast cell degranulation with an extreme histamine reaction. (*Id.*). Ms. Harper has an EpiPen, gets rashes frequently, and sometimes has a histamine reaction requiring her to use the EpiPen. (*Id.*). Ms. Harper related she has tried a variety of jobs, but has difficulty finding work that does not cause anxiety or raise her temperature. (*Id.*). Ms. Harper indicated that in her last job she even had trouble getting to her car or helping her clients in and out of her car. (*Id.*).

During examination, Ms. Harper exhibited dermatographia[3] and her sensory exam was abnormal. (Tr. 330). She had decreased pinprick sensation in her right leg and up her spine. (*Id.*). Muscle strength was normal and there was no evidence of atrophy. (Tr. 330, 332-35). Range of motion was within normal limits. (*Id.*). Cerebellar function was intact. (Tr. 330).

Dr. Offutt summarized her findings as follows:

The claimant is a 41-year-old female who wants to work, but cannot work because she has mastocytosis. She has a condition that if her body temperature goes up at all, she starts to sweat and her mast cell degranulate and she has an extreme histamine reaction. She has been treated with a variety of antihistamines and she has been referred to the Cleveland Clinic for examination and treatment. She has been told that they may suggest a kind of chemotherapy. She finds that she cannot be in any environment where the temperature changes, even anxiety causes her to have [a] histamine reaction. It can be anywhere from a rash to anaphylaxis. She has stopped breathing before. She has an EpiPen with her at all times. Because of this condition, she would not be able to be in any environment that had any kind of temperature changes. The problem is that she may not be able to get to work if it is hot outside, just walking into work may cause her to have a histamine reaction.

. . .

---

[3] Dermatographia is also known as "writing on the skin" because it creates an eruption or wheal when pressure is applied to the skin. Timothy Nobles; Mikel E. Muse, George J. Schneider, *Dermatographism*, National Library of Medicine, http://www.ncbi.nlm.nih.gov/books/NBK531496/ (February 23, 2022). The release of histamine from mast cells is thought to play a role, although the exact cause of dermatographia is unknown. *Id.*

> She may find that they treat her at the Cleveland Clinic and she has better control of her disease, but at this time she would not be able to be in any work environment that I can think of.
>
> WORK SUMMARY: The claimant's ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects is at least severely impaired due to the stated factors.

(Tr. 330-31).

## IV.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Harper and VE Larry Bell, presented during the hearing before the ALJ.

Ms. Harper, represented by counsel, appeared before the ALJ in a telephonic hearing on July 22, 2020. (Tr. 35-71). Moving backwards in her record, Ms. Harper was self-employed for a time, driving people to doctor appointments using a company car. (Tr. 48). This was a seated position; she did not have to do any lifting in this position or assisting the clients; all were required to be mobile. (Tr. 48-49). She also worked for a number of years as a pizza delivery driver. (Tr. 49-50). She had past work as a finance manager for an auto lot. (Tr. 50). She also worked as a waitress at Bob Evans. (Tr. 51).

Ms. Harper described how she experiences the anaphylactic effects of her mast cell disease as follows:

> If I sweat, at all, through exertions, emotions, if I stub my toe—anything that would cause me to start to sweat, then I will break out in a rash from the bottom of my neck to the tops of my feet. And that will swell into bumps on my skin. And then I have trouble breathing, and my heart starts racing. And then I just get dizzy and go unconscious.

(Tr. 51-52). She must use an EpiPen immediately at onset of the symptoms to avoid unconsciousness. (Tr. 52). Activities that can cause Ms. Harper to sweat can include going to the

bathroom, walking up and down stairs, walking outside into the sunshine, getting upset with her children, or strong smells. (*Id.*). Ms. Harper can go into anaphylaxis if someone wearing perfume walks into the room. (*Id.*). Emotional reactions—such as sweaty palms—can cause a reaction. (*Id.*).

Ms. Harper does not have to be "drenched in sweat" to have a reaction. (*Id.*). As she testified, "the reaction starts even before the sweating starts . . . the rash is what lets me know that my temperature's changing." (*Id.*). It takes only a couple of minutes for her symptoms to set in; within five minutes, she will become completely unconscious. (Tr. 63). Each reaction results in unconsciousness without intervention; she would go into anaphylaxis if she did not use the EpiPen. (Tr. 52-53). Sometimes, a "rebound reaction" will occur, requiring Ms. Harper to use two EpiPen doses in succession to control her symptoms. (Tr. 63). It can take an hour for Ms. Harper to return to normal after a reaction. (*Id.*).

Ms. Harper also experiences other symptoms from the mastocytosis called "third spacing," where the mast cells "leak" into nerves and bone. (Tr. 61). Mast cells often settle into the small joints of knuckles, wrists, and toes, causing swelling and pain. (*Id.*). Ms. Harper is unable to take pain medication or antibiotics because the mast cells will react to the medications. (Tr. 62).

Ms. Harper lost her last job—driving people to the hospital—after she needed to use an EpiPen while transporting a client. (Tr. 53). The incident occurred when she was stopped in traffic and the sun was shining through the windshield; the car's air conditioning was not cold enough and she felt she was going to go unconscious, so she used her EpiPen with the client in the backseat. (*Id.*). She was terminated because it was too dangerous, given her condition. (*Id.*).

Ms. Harper also experiences panic attacks while in crowds of people. (Tr. 53-54). Despite Ms. Harper isolating herself, she still experiences a panic attack every couple of weeks. (Tr. 54).

These panic attacks will cause tunnel vision and shaking. (*Id.*). She then will break out into a rash, causing more anxiety due to the pending effects of her mastocytosis-caused anaphylaxis. (*Id.*).

Ms. Harper also has GERD, gastritis, and IBS, which cause cramping and diarrhea. (Tr. 54-55). The pain and cramping from these gastrointestinal issues cause Ms. Harper to sweat, but she is able to manage by taking cold showers while toileting. (*Id.*).

Ms. Harper is not able to cook much because she cannot stand over the stove without beginning to feel sick. (Tr. 55). She was able to do more before her diabetes diagnosis, but finds it more difficult to control her symptoms due to the effects of her high blood sugar levels. (Tr. 55-56). The symptoms of mastocytosis are now triggered faster than they were before her diabetes diagnosis. (Tr. 56). If her blood sugar drops overnight, she can wake up in a sweat and need to use an EpiPen. (*Id.*).

Ms. Harper testified her mastocytosis has become more severe over time. (Tr. 56). She explained that the disease is not curable, despite a more recent bone marrow biopsy showing as "normal." (Tr. 57). According to the Mastocytosis Society, it is complicated to properly stain and read biopsy samples for mast cells, and the most recent biopsy may have been improperly stained or read. (Tr. 56-57). It is also possible that the lowered mast cell load was caused by additional antihistamines she had taken in the days prior to the biopsy. (Tr. 58). Ms. Harper explained she "premedicates" by taking additional doses of medications such as Zyrtec, Singulair, Pepcid, Benadryl, and her EpiPen to prevent anaphylaxis during procedures, or other planned events such as the administrative hearing. (Tr. 58).

She treats with her primary care physician and a hematologist. (Tr. 59). She has not gone to the emergency room for the past two years. (*Id.*). She initially would go to the emergency room

each time she used an EpiPen but stopped when she realized that the emergency department would only have her sit for 30 minutes to monitor for heart attack or other problems. (Tr. 59-60). She uses an EpiPen two to three times per month. (Tr. 61).

The VE then testified. He identified Ms. Harper's past work as pizza delivery driver, medium, semi-skilled, SVP 3, DOT 292.353-010, medium as classified, light as performed. (Tr. 66). Her driver job with her private car is sedentary, semi-skilled, SVP 3, DOT 913.663-018, medium as classified. (*Id.*). Waitress is light, semi-skilled, SVP 3, DOT 311.477-030; data entry clerk, sedentary and semi-skilled, SVP 4, DOT 203.582-054. (*Id.*).

The ALJ then asked the VE to consider a hypothetical individual of the same, age, education and work background as Ms. Harper, capable of performing sedentary work, but with limitations including no crawling or climbing, no more than occasional balancing, crouching, kneeling, or stooping; no exposure to extreme heat and cold, wetness and humidity, or hazards such as dangerous moving machinery or unprotected heights; no outside work; no concentrated exposure to respiratory irritants; no assembly line or piecemeal production requirements; no more than occasional changes in work routine or work setting; no contact with the public; and no more than occasional interaction with coworkers and supervisors. (Tr. 66-67). The VE responded that the only past work an individual so limited could perform is that of a data entry clerk. (Tr. 67). There were other available jobs in the national economy, including table worker, DOT 739.687-182, sedentary, unskilled, SVP 2, 13,000 jobs available nationally; final assembler, DOT 739.687-182, sedentary, unskilled, SVP 2, 15,000 jobs available nationally; and security surveillance monitor, DOT 379.367-010, sedentary, unskilled, SVP 2, 9,400 jobs available nationally. (Tr. 67).

The VE testified an employee would be precluded from competitive work if the person was off-task ten percent or more of the time; this included all of Ms. Harper's past work previously identified. (Tr. 68). Similarly, if an individual was absent from work for two days or more per month and this behavior was not corrected after intervention from supervisors, the individual would be terminated. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated October 7, 2020, included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2023.

2.  The claimant has not engaged in substantial gainful activity since June 6, 2018, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: systemic mastocytosis; hypothyroidism; asthma with chronic obstructive pulmonary disease/ emphysema; vitamin D deficiency; lateral epicondylitis and partial tendon tear of the left elbow; major depressive disorder; and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  The claimant has the residual functional capacity to perform sedentary work, as defined in the regulations, with the following limitations: no crawling or climbing; no more than occasional balancing, crouching, kneeling or stooping; no exposure to extreme heat and cold, wetness and humidity, or hazards such as dangerous moving machinery or unprotected heights; no concentrated exposure to respiratory irritants; no outside work; no assembly line or piecemeal production requirements; no more than occasional changes in work routine or work setting; no contact with the public; and no more than occasional interaction with co-workers and supervisors.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on June 3, 1977 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 6, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-30).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

At the same time, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

Moreover, even if sufficient evidence exists in the record to support the decision, a district court cannot uphold an ALJ's decision where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). And, even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own

13

procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Harper argues the ALJ's determination is unsupported by substantial evidence because she failed to articulate her analysis of the opinion of the CE, Dr. Offutt. (Pl.'s Br., ECF #11, PageID 784). Ms. Harper further argues the ALJ's Step Five finding is not supported by substantial evidence because the ALJ did not pose a hypothetical to the VE accurately setting forth Ms. Harper's limitations as opined by Dr. Offutt. (Pl.'s Br., ECF #11, PageID 786-87).

For the reasons set forth below, I agree with Ms. Harper on both issues. Accordingly, I recommend the District Court reverse and remand this matter for further proceedings.

**I.      The ALJ'S RFC determination is not supported by substantial evidence because it omits analysis of Dr. Offutt's opinion evidence.**

According to Ms. Harper, the ALJ's RFC determination that Ms. Harper can perform a reduced range of sedentary work is in error, because, contrary to the regulations, the ALJ omitted any analysis of Dr. Offutt's opinion. (*Id.* at PageID 785-86). The Commissioner responds that the ALJ was not required to articulate how persuasive she found Dr. Offutt's findings because Dr. Offutt did not provide a medical opinion. (Comm'r's Br., ECF #13, PageID 793-94). The Commissioner's argument to ignore the ALJ's omission is unpersuasive.

For claims filed on or after March 27, 2017, an ALJ evaluates medical opinion evidence using a new paradigm. *See* 20 C.F.R. §§ 404.1520c; 416.920c. Ms. Harper filed her claim on August 1, 2018; thus, §§ 404.1520c and 416.920c control. These regulations provide the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical

15

opinion(s) or prior administrative medical finding(s)" including those from the claimant's medical sources. *Id.* at §§ 404.1520c(a) & 416.920c(a). The ALJ is not required to place medical opinions into a hierarchy and is not required to give a treating source controlling weight. *Id.* Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[4] and consistency.[5] *Id.* at §§ 404.1520c(b) & 416.920c(b).

Although the regulations eliminate physician hierarchy, deference to specific medical opinions, and assigning specific weight to a treating physician's medical opinion, an ALJ must still articulate how the medical opinions were considered and how they were determined to be persuasive. *Houston v. Saul*, No. 1:20-CV-1371, 2021 WL 2635376, at *11 (N.D. Ohio June 25, 2021) (internal quotations omitted). The court reviews this articulation of persuasiveness to evaluate whether the ALJ properly considered the factors as set forth in the regulations. *Id.* An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination is supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021) (internal quotation omitted). Agency regulations require the ALJ to "articulate in [her] determination or decision how persuasive [she] find[s] *all* of the medical opinions . . . in [the claimant's] case record." 20 C.F.R. §§ 404.1520c(b) & 416.920c(b); *see also Rogers v. Comm'r of Soc.*

---

[4]    "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1) & 416.920c(c)(1).

[5]    "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2) & 416.920c(c)(2).

*Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (substantial evidence review requires that "all determinations be made based upon the record in its entirety.").

Further support is found in the Social Security Administration's own policy interpretations. Social Security Ruling 96-8p explicitly states: "The RFC assessment *must always* consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator *must* explain why the opinion was not adopted. SSR 96-8p, 1996 WL 374184 (emphasis added).

The Commissioner contends a "medical opinion" is a term of art under the regulations. (Comm'r's Br., ECF #13, PageID 793). I agree. But the Commissioner misses the mark in asserting that Dr. Offutt's summarized limitations are not an opinion under the regulations because they do not state what Ms. Harper can still do. (*See id.*). The Commissioner provides a portion of the regulations to explain that a medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) . . ." (*Id., citing* 20 C.F.R. § 404.1513(a). However, the regulations as fully set forth provide:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:
>
> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> . . .
>
> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. §§ 404.1513(a)(2)(i),(iv) & 416.913(a)(2)(i)(A), (D).

17

The Commissioner relies on *Pierce v. Comm'r of Soc. Sec.*, No. 3:16cv421, 2017 WL 1017470, *1 (N.D. Ohio Mar. 16, 2017), for the proposition that an ALJ has no obligation to specify how persuasive she finds a physician's statement that is not an opinion. (Comm'r's Br., ECF #13, PageID 793). But *Pierce* is easily distinguishable. The court ruled in *Pierce* that the claimant's doctor's *treatment notes* were not a medical opinion under the regulations and therefore the ALJ was not required to explain their persuasive value. *Pierce*, 2017 WL 1017470, at *1 ("Dr. Qureshi did not tender a 'medical opinion,' as the Social Security regulations define that term. . . . Rather, Qureshi's notes simply document S.J.P.'s subjective account of her symptoms and his own observations about her behavior, thought processes, mood, and the like.").

That is not the case here. Ms. Harper is not arguing that a provider's treatment notes should be considered a medical opinion. Instead, she argues that the CE—a medical professional contracted by the Agency specifically to provide a medical opinion[6]—was not considered, nor explained by the ALJ. (Pl.'s Reply Br., ECF #14, PageID 796-98).

---

[6]     According to the Social Security Administration, a CE must, at minimum, contain a medical opinion that "assess[es] the claimant's ability to perform the demands of work activities, and any limitations based upon the claimant's medical history, medical signs and observation during the examination, and results of relevant laboratory and imaging tests," including all of the following:

a.     The CE provider will specify the nature and extent of the condition(s) or disorder(s);
b.     The CE provider will discuss any apparent discrepancies in the medical history and/or in the examination findings; and
c.     The CE provider will specify any limitations in functioning that result from the condition(s) or disorder(s), including:
   1.     Lifting, carrying, pushing, pulling;
   2.     Sitting, standing, walking;
   3.     Postural (for example: climbing, stooping, bending, balancing, crawling, kneeling and/or crouching);

At issue is Dr. Offutt's statement, as follows:

Because of this condition [systemic mastocytosis], she would not be able to be in any environment that had any kind of temperature changes. The problem is that she may not be able to get to work if it is hot outside, just walking into work may cause her to have a histamine reaction.

. . .

She may find that they treat her at the Cleveland Clinic and she has better control of her disease, but at this time she would not be able to be in any work environment that I can think of.

WORK SUMMARY: The claimant's ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects is at least severely impaired due to the stated factors.

(Tr. 330-31). The ALJ's decision is silent as to the persuasiveness of Dr. Offutt's examination.[7] (*See*

Tr. 27-28).

---

    4.      Fine or gross motor skills (for example; handling, fingering, gripping, and/or feeling);

    5.      Overhead, lateral, and forward reaching:

    6.      Vision, hearing, and speech; and

    7.      Environmental exposures (for example: extreme heat, extreme cold, wetness, humidity, noise, vibration, and hazards).

Social Security Administration, *Consultative Examinations: A Guide for Health Professionals Part IV - Adult Physical Consultative Examination (CE) Report Content*, http://www.ssa.gov/disability/professionals/greenbook/ce-adult.htm (last visited June 20, 2022).

[7]      I acknowledge that the ALJ's decision contains the following discussion:

The consultative examiner provided what was deemed a "functional assessment," but this assessment did not offer a function-by-function analysis of the claimant's work-related abilities. The consultative examiner recounted the relevant findings in the areas of understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; interacting with others; and adapting or managing oneself, but he declined to link these relevant findings to specific conclusions about the claimant's functioning. Rather, the consultative examiner has left it up to the reader to reach specific conclusions about the claimant's functioning based on the information he provided. As such, the consultative examination is well supported

Dr. Offutt's statements regarding Ms. Harper's limitations appear to satisfy the Agency's requirements to be considered a medical opinion, as they describe limitations in environmental exposure ("she would not be able to be in any environment that had any kind of temperature changes" and "she may not be able to get to work if it is hot outside, just walking into work may cause her to have a histamine reaction. . . . at this time she would not be able to be in any work environment that I can think of.") and Ms. Harper's limitations in her ability to perform the physical demands of work activities ("The claimant's ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects is at least severely impaired . . . ."). (*Compare* Tr. 330-31 *with* 20 C.F.R. §§ 404.1513(a)(2)(i),(iv) & 416.913(a)(2)(A),(D)).

Because I find Dr. Offutt's statements are medical opinions under Agency regulations, the ALJ was required to articulate their persuasiveness. Because she did not, substantial evidence does not support her RFC findings. Substantial evidence requires consideration of the record taken as a whole. *Brooks*, 531 F. App'x at 641. Remand is required where the Agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson*, 378 F.3d at 546-47.

---

but it is not found consistent with the evidence as a whole because there are no specific functional limitations to compare with the medical evidence of record. The objective findings from the consultative examination are highly probative, particularly in regards to assessing the "paragraph B" criteria. However, to the extent the consultative examination is considered a medical opinion, it is not considered persuasive for the aforementioned reasons.

(Tr. 27-28). Although this paragraph does not specifically identify the CE provider, I do not read it as referring to Dr. Offutt. Rather, the references to "paragraph B" criteria suggest the ALJ was referencing the psychological CE conducted by Bryan J. Krabbe, Psy.D. (*Compare* Tr. 27-28 *with* Tr. 337-43).

I therefore recommend the District Court remand for the ALJ to articulate the persuasiveness of Dr. Offutt's opinion.

**II.    The ALJ's Step Five determination is not supported by substantial evidence because the VE was not given an opportunity to respond to a hypothetical accurate to Ms. Harper's potential limitations.**

Ms. Harper further argues the ALJ's Step Five finding is not supported by substantial evidence because the ALJ did not pose a hypothetical to the VE accurately setting forth Ms. Harper's limitations as opined by Dr. Offutt. (Pl.'s Br., ECF #11, PageID 786-87). The Commissioner does not specifically respond to this contention. (*See* Comm'r's Br., ECF #13, PageID 793-94). I agree with Ms. Harper, but only to the extent the ALJ may only rely on a VE's testimony when it accurately reflects a claimant's limitations. Because the ALJ was silent as to her consideration of Dr. Offutt's opined limitations, and because the extent of those limitations were not contained in the hypotheticals posed to the VE, I cannot determine if the VE's testimony is substantial evidence to support the ALJ's Step Five findings.

In the five-step sequential analysis, the claimant has the burden of proof in Steps One through Four, but at Step Five, the burden shifts to the Commissioner to establish whether the claimant has the RFC to perform work available in the national economy. *Walters*, 127 F.3d at 529. To meet this burden, the ALJ must make a finding, supported by substantial evidence, that the claimant has the vocational qualifications to perform specific jobs. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (internal quotations omitted). An ALJ may rely on a VE's testimony in reaching this conclusion, so long as the hypothetical RFC accounts for the claimant's limitations. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (quoting *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d. 777, 780 (6th Cir. 1987)). This, however, does not mean that a

hypothetical posed to the ALJ must include a listing of all of the claimant's medical impairments. *Id.* Nor does it impose on the ALJ a requirement to include all limitations proposed in the evidence. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). An ALJ may reject limitations and "is only required to incorporate those limitations which he has deemed credible." *Id.*

Only the ALJ has the authority to determine a claimant's medical restrictions and the resulting RFC; the VE does not determine which restrictions the claimant in fact has. *Kessans v. Comm'r of Soc. Sec.*, 768 F. App'x 531, 536 (6th Cir. 2019). An ALJ may pose a question regarding a hypothetical individual including several limitations, but later determine the VE's response is not relevant as to the claimant's abilities. *Id.* at 535-36. Requiring that an ALJ rely on the VE's response to the most restrictive question involving a hypothetical individual would controvert the roles of the ALJ and the VE. *Id.* Asking a hypothetical of a VE is not a finding and does not bind an ALJ to a VE's response. *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020). Rather, a VE's response to a hypothetical serves as substantial evidence of the claimant's ability or lack thereof. *Kessans*, 768 F. App'x at 535-36.

Here, the ALJ posed the following hypothetical to the VE:

Assume an individual of the same age, education, and work background as Ms. Harper, who's capable of performing sedentary work, as defined in the regulations, but has the following limitations. There should be no crawling or climbing; no more than occasional balancing, crouching, kneeling, or stooping; no exposure to extreme heat and cold, wetness and humidity, or hazards such as dangerous moving machinery or unprotected heights; no outside work; no concentrated exposure to respiratory irritants. No assembly line or piecemeal production requirements; no more than occasional changes in work routine or work setting; no contact with the public; and no more than occasional interaction with coworkers and supervisors.

(Tr. 65-66). The ALJ then used the VE's testimony to support her Step Five finding that there are jobs available in the national economy that Ms. Harper can perform. (*See* Tr. 28-29).

But without an articulation from the ALJ as to the persuasiveness of Dr. Offutt's opined limitations, as discussed above, I am unable to determine if the hypothetical RFC posed to the VE accounts for Ms. Harper's limitations, and consequently, if the VE's testimony can serve as substantial evidence to support the ALJ's Step Five findings. *See Webb*, 368 F.3d at 633. I therefore recommend the District Court remand for consideration of this issue.

### Conclusion and Recommendation

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: June 21, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or**

whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).